OPINION OF THE COURT
Jeffrey M. Atlas, J.
At the conclusion of a six-week trial held before me without a jury, the defendant has been found guilty of eight felony counts, each charging that he committed the crime of offering a false instrument for filing, in the first degree. The defendant has moved, however, to set aside the verdicts and I am compelled, for the reasons set forth in this opinion, to grant his motion.
The indictment alleged and the People have proved that, between December, 1977 and March, 1978, the defendant filed eight separate applications with the New York City Department of Housing Preservation and Development, each application pertaining to a different building owned by him, and each seeking for its respective building an exemption and abatement of real estate tax. The People have also alleged and proved that, for the purpose of *850 ultimately and fraudulently inducing the city to grant benefits to him, the defendant, in his applications, falsely represented the costs and extent of improvements claimed to have been made by him to each respective building during the years 1976 and 1977. The indictment, in each count, alleged that the respective application for tax benefits submitted by the defendant was a false “written instrument”, as that term was used in section 175.35 of the Penal Law, in effect during the period in which each application was filed. Difficulties with that proposition are presented, however, in view of the fact that during the period in which the applications were filed,. December, 1977 through March, 1978, article 175 of the Penal Law contained no legislative definition of the words “written instrument”. Indeed, the defendant has maintained throughout the trial, and, does now on this motion to set aside, that current judicial interpretation of those crucial words is so narrow as to preclude these applications from being “written instruments”.
At the time that I deliberated upon a verdict in the matter (after having reserved decision on defendant’s trial motion of dismissal), it was evident to me that defendant was correct in his contention. However, dismissal before verdict seemed unwise. It was clear to me that, assuming the People’s expansive definition of the words “written instrument” to be correct, the People had, in all respects, proved the defendant’s guilt beyond a reasonable doubt. Moreover, since judicial interpretation of the expression in issue has largely come from Court of Appeals decisions that might reasonably be interpreted as reflecting an increasingly expansive view of the term (see People v Bel Air Equip. Corp., 39 NY2d 48),[1] it seemed fair that the People be given every opportunity to seek appellate review which, if resolved favorably for them, might simply result in reinstatement of the verdicts. Indeed, mindful of the view of our Court of Appeals in this regard (see People v Key, 45 *851 NY2d 111; People v Brown, 40 NY2d 381), the rendering of the verdicts, as an expression of my judgment as trier of the facts and the present setting aside of the verdicts, as an expression of my understanding of the law and my conscience, seems the only reasonable course to follow.
As to the substance of the defendant’s motion to set aside the verdicts because the documents in question were not written instruments under section 175.35 of the Penal Law, certain aspects of the New York City tax exemption and abatement program, commonly known as the J51 program, as they were established at trial, must be carefully examined.
The Administrative Code of the City of New York has provided for a number of years, including the period 1977 through 1978, that increases in the assessed value of certain buildings which result from alterations and improvements to those buildings are exempt from local taxation for a fixed period and to the extent that such increases result from the reasonable cost of such alterations or improvements. (Administrative Code, tit J, § J51-2.5, subd b.) Moreover, by virtue of the same code provisions, taxes from such improved property become the subject of annual abatement and reduction of local tax in an amount no greater than 8V3% of the reasonable cost of the alterations or improvements. (Administrative Code, tit J, § J51-2.5, subd c.)
During the period of time in issue, that is, 1977 through part of 1978, the Administrative Code of the City of New York, the regulations promulgated under it and the practices of the Department of Housing Preservation and Development (HPD) in administering this tax incentive program, established the procedure for filing and processing of applications to receive the benefits of the program.
Pursuant to that established procedure, the defendant, owner of the eight buildings in question, filed with HPD for each building, an “Application for Tax Exemption and Abatement for Alterations pursuant to J51” (the J51 application). Each four-page J51 application provided information pertaining to the owner of the building in question, preliminarily established eligibility of the building for the benefits sought, included an affidavit by the owner certify *852 ing the accuracy of the information supplied by the application and, finally, in two pages, listed specifically the items and costs of alterations or improvements to that building for which the owner had applied for benefits. In each instance it is this last list that the People have alleged and established was false.
In addition to those documents, and pursuant to the regulations, each application was accompanied by, among other things, a certification by a certified public accountant of the cost of alterations or improvements as reflected in the books and records of the owner. In this case, the evidence established that these certifications were over the forged signature of a certified public accountant.[2]
The tax relief sought by the defendant did not accrue, however, solely upon the submission of these documents to HPD. Among other less significant things, each application was then reviewed for eligibility and, in certain circumstances, for verification of the work claimed in its itemized schedules. While not required under the regulations for all applications, at times, as in this case, the itemized portion of each application was delivered to an HPD rehabilitation specialist whose responsibility it was, by field inspections, to verify that the claimed work was done in the quantity stated on the schedules. Indeed, in this case, each application had been endorsed by such an inspector in a manner suggesting that he had verified the work claimed on the schedules. Thereafter, each application was reviewed again by an HPD cost estimator who allowed to the applicant, for each item of work claimed, only those maximum amounts allowed by the regulations.
Still, the J51 application, at this juncture, did not translate into immediate tax advantage for the defendant. Indeed, all applicants for these benefits ultimately sought of HPD, upon its finding of eligibility of the property and upon verification of the applicant’s assertions, a certificate of reasonable cost (CRC) which certified the costs of improvements allowed by HPD to that applicant. The CRC was available to an applicant, however, only upon further submission to HPD of a certification for tax exemption and *853 abatement issued by the department of buildings, commonly known as a “TA3”.
The issuance of a TA3 was itself subject to another set of rules at least superficially complied with by the defendant here. The TA3 was a certification that work in relation to the premises and alterations had been completed and inspected in accordance with the rules and regulations of the department of buildings and that the premises had been found to be structurally sound, complied with applicable provisions of law and provided central or other appropriate and approved heating.
Generally, issuance of the TA3 was initially generated by the mandatory filing, with the New York City Department of Buildings, of a building notice application (BN application) for each building, outlining the alterations to be done to that property and seeking approval of the plans and specifications submitted as part of the BN application. Based upon the estimated cost of the alterations, supplied by the applicant, a fee was charged and had to be paid before issuance of a permit for the work. In the case of each of the eight buildings at issue here, no BN application had been filed by the defendant prior to the performance of any alteration work claimed by him to have been done. Nonetheless, in keeping with established department of buildings procedure, the defendant, in most instances before he filed his J51 application, but, at least once after such filing, caused BN applications to be filed to “legalize” alteration work allegedly done and completed before the filing of the BN application. Satisfying a further prerequisite to the issuance of the TA3, a registered architect hired by the defendant certified to the department of buildings that the “legalized” work had been inspected by him and found satisfactory and in compliance with applicable code provisions, laws, and regulations. Additionally, it should be noted that, in each instance, the work declared by the defendant’s original BN applications as having been done was considerably lower in quantity and cost than what was claimed as done by the defendant in each J51 application. Consequently, in accordance with established requirements and to insure issuance of the TA3, the defendant filed an amendment to each BN application declaring the *854 additional work and values claimed on the J51 applications, and paid additional fees, computed upon these newly claimed sums.
Finally, since plumbing alterations were claimed to have been done by the defendant, he was required to and did apply, through his contractor, for plumbing and alteration repair slips filed with the department of buildings to “legalize” work claimed as previously done in each building. In accordance with city regulations, certification was thereafter made, presumably after inspection, by a city plumbing inspector that all plumbing work was installed in accordance with the rules and regulations of the department of buildings.
At last, all these things having been completed after the filing of his J51 application and all outstanding building violations of record having been cleared by the defendant for each building, a TA3 then issued for each of the premises and served as further predicate for the issuance of the CRC.
While near the end of the process, tax benefits still did not accrue upon issuance to the defendant of these two documents. The defendant was finally required to and did file with the New York City Finance Administrator, yet another application for exemption and abatement of tax, supported, not only by the CRC and TA3, but, also by a certification of the Department of Finance that there existed no outstanding liens for taxes or charges due to the city.[3]
Once this final application to the finance administration had properly been made, then, after simple mathematical computations were performed with respect to the sums certified by the CRC, the amount of the proposed abatement for each building was simply passed along to the city collector for implementation, while the exemption remained unaccrued and subject to further scrutiny upon further independent assessment of the value of the property._
*855 It is in the context of these facts that defendant contends the false J51 applications submitted by him to HPD were not “written instruments” as that term was used in article 175 of the Penal Law before its amendment in 1978.
Inexplicably, section 175.35 of the Penal Law (and the misdemeanor, Penal Law, § 175.30), like its predecessor, section 2051 of the Penal Law, was enacted without the benefit of a legislative definition of the word “instrument”. In fact it was not until 1978, after the events in issue here, that a precise legislative definition of the term came into existence by amendment to article 175 of the Penal Law.[4] The consequence of the Legislature’s past failure to define the term in the context of sections 175.35 and 2051 of the Penal Law has been the evolution of a small and finite body of decisional law which must now be searched, perhaps for the last time in any case, to provide a reasonably precise definition of the term in issue.
Section 175.35 of the Penal Law derives, albeit in narrower version, from section 2051 of the Penal Law of 1909 which proscribed the knowing offering of a false or forged instrument to be filed in this State, which instrument, if genuine, might be filed “under any law of this state or of the United States” but, as I have noted, failed to define the word “instrument”. In People v Sansanese (17 NY2d 302, 306), our Court of Appeals, noting that penal responsibility could not be extended by it beyond the fair scope of the statutory mandate of section 2051 of the Penal Law, maintained that it was not being overly technical when it interpreted the word “ ‘instrument’ * * * in the light of the extremely narrow construction which the term ‘instrument’ has been otherwise given.” As to its traditional construction the court noted (supra, p 306): “An instrument has been defined as a ‘formal or legal document in writing, such as a contract, deed, will, bond, or lease’ (Black’s Law Dictionary [4th ed., 1951, p. 941]), and as a *856 legal document (as a deed, will * * *) evidencing legal rights or duties, esp. of one party to another’ (Webster, Third New Int. Dictionary [1961], p. 1172).” (Emphasis supplied.)
In this respect, I reflect upon the fact that at common law the term “instrument”, when used with respect to a false or forged document, was generally defined as any writing which, upon its face, was likely, if false, to defraud. (See People v Krummer, 4 Parker Cr Rep 217; Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 170.00, p 270.) Whether by inadvertence or not, the Penal Law of 1909 not only failed to define the term “instrument” but, with respect to the crime of forgery, created, not one general crime consistent with the common law but, numerous crimes proscribing only the forgery of certain and specifically described documents. (Penal Law of 1909, §§ 884, 887.) This legislative scheme, by its failure to acknowledge the common-law definition of the term “instrument”, was viewed as narrowing the crime of forgery from that known at common law. (See Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 170, p 270.) While the court in Sansanese did not review the changes resulting from the legislation of 1909, the result reached by it was not inconsistent-with the Legislature’s apparently narrow view of forged instruments. Indeed, the documents described by sections 884 and 887 of the Penal Law of 1909, clearly fell within the available dictionary definitions for the plain meaning of the term “instrument” as employed in section 2051 of the Penal Law.
In 1968, upon the passage of a new Penal Law, section 175.35 of the new law preserved so much of section 2051 of the Penal Law as proscribed the filing of false written instruments. I have earlier noted that this legislation failed, in article 175, to define the term “instrument”. The Legislature did, however, restore the broad common-law definition to article 170 dealing with forged instruments.
Notwithstanding that an inference could have been drawn from the language of the new law that the Legislature intended to proscribe the filing of false documents that might serve by their filing to ultimately defraud the State, *857 the Court of Appeals, in People v Gottlieb (36 NY2d 629), carried over and adopted for article 175 the narrow definition of the term “instrument” used by it with respect to the earlier and predecessor statute.[5]
Once again, in 1976, the Court of Appeals was presented with the opportunity to discuss this crucial term used in section 175.35 of the Penal Law. Called upon to determine if a standard voucher seeking payment from the State for relocation expenses was a written “instrument”, the court declared that the issue must be resolved by careful analysis of the character and contents of the document to determine (1) whether the particular document falls within the literal scope of the statute and (2) whether the document is of such a character that the mischief the statute seeks to prevent would ensue if the document were filed. (People v Bel Air Equip. Corp., 39 NY2d 48, 55, supra.) This test, rather than suggesting any reversal of its earlier position, really adopted and refined the approach of both People v Sansanese (17 NY2d 302, supra) and People v Gottlieb (36 NY2d 629, supra). Indeed, the continued vitality of the earlier decisions was acknowledged by the court (and particularly by Judge Gabrielli, author of Gottlieb, in a concurring opinion joined in, as was Judge Jasen’s opinion by five other Judges of the court). „
What we may conclude then, is that a document within the “literal scope” of the statute is a legal document evidencing legal rights or duties, especially of one party to another, such as a deed, will, contract, or even, as the court found the standard State voucher to be, a nonnegotiable draft. Moreover, if such a document is false and one upon which the State would act in the belief that it is accurate and true, then it is a written “instrument” within the meaning of the law. (People v Bel Air Equip. Corp., supra, at p 54.)
*858 Finally, in search of further clarification of the issue, one must closely attend to the analysis of the document in Bel Air (supra). The court held that the voucher before it, in directing payment to the presenter or his designee, called into immediate action the lawful obligation of the State and was, in effect, a demand or nonnegotiable draft which, by its terms, represented obligations allegedly owing by the State. (People v Bel Air Equip. Corp., supra, at p 55.) Possessing the characteristics of a formal legal document, the voucher evidenced the rights and duties of the parties in that, upon certification of completion of the work, the maker was then entitled to be paid by the State which had to rely upon the verity of the instrument in acting upon and discharging its obligation (People v Bel Air Equip. Corp., supra, at p 57 [concurring opn of Gabrielli, J.]; see, also, People v Gotthainer, 82 AD2d 922; People v Russell, 87 Misc 2d 665, 670-671).
Upon the facts found by me here, I cannot conclude that the J51 applications submitted by the defendant to HPD to initiate a process which might culminate in the granting of a tax abatement or tax exemption or both, in any way evidenced a present right in the defendant to the benefits sought, or, a contemporaneous obligation on the part of the city to give it. Indeed, the applications and their respective false schedules constituted only the initial step in a rather cumbersome process that might succeed in the granting of benefits only after successful completion of a number of intervening events, e.g., certification of inspection of the work claimed, cost estimation, finding of eligibility, filing and approval of BN applications and payment of fees thereon, amendment to the BN applications filing and approval of plumbing and alteration slips, issuance of a TA3, issuance of a CRC, and finally the filing of another application for tax exemption and abatement, accompanied by a Department of Finance certification, with the Finance Administration of the City of New York.
Clearly, we must distinguish between filing documents which falsely recite information capable at some time of being used to the advantage or disadvantage of some person (Penal Law, § 170.00, as it embodies the common law) and those false legal documents, which, upon their *859 filing, in fact then obligate the city to promptly give the benefit sought by the false document. (People v Bel Air Equip. Corp., 39 NY2d 48, supra; People v Gottlieb, 36 NY2d 629, supra; People v Gotthainer, 80 AD2d 922, supra.)
Plainly the J51 applications alleged as written “instruments” in this case could not, upon their filing with HPD, have promptly called into fulfillment any purported obligations of the city. Indeed, the writings at the time of their filing at HPD reflected no right in the defendant to the benefits sought and such obligations of the city as might have accrued to the defendant could have vested only after completion of a great many additional tasks, the success of none of which were assured to the defendant. Moreover, at no time was the city obliged or expected to rely solely upon the certification of the defendant as to the verity of the documents filed in discharging its responsibilities. To the contrary, the governing regulations and practices pertaining to the approval of such applications mandated fulfillment of a wide variety of conditions precedent, not the least of which was independent verification of the work schedules, before issuance of further documents necessary to the success of the applications. (See People v Gotthainer, supra.)
In short, the J51 applications were not legal documents but, merely and in the traditional sense, applications which recited information and requested the city to take a specified action favorable to the applicant but not founded on a duty nor granted as of right. (People v Bel Air Equip. Corp., supra, at p 57 [concurrence of Gabrielli, J.]; People v Russell, 87 Misc 2d 655, 670-671, supra.)
The motion to set aside the verdicts upon the ground that the J51 applications are not “written instruments” is therefore granted. As to the two remaining grounds asserted by the defendant in support of the motion (that the People improperly elected to prosecute under Penal Law, § 175.35, a felony statute, rather than the specific misdemeanor provision of the Administrative Code proscribing the filing of false J51 applications and that the People were limited to prosecution under the Administrative Code by virtue of notice provisions in the J51 application), the *860 motion is denied. A motion to dismiss the indictment, as a consequence of the granting of the motion to set aside, is granted.

. “To begin with, the term instrument is not one susceptible to an exact, precise and inelastic definition. It is employed in many different contexts in our law and its meaning shifts, sometimes subtly, sometimes not, depending on the context *** While in all cases the term serves to identify a class of paper writings, the type of document sought to be included in, or for that matter excluded from, the scope of a particular statutory enactment varies with the purpose that enactment seeks to serve.” (People v Bel Air Equip. Corp., 39 NY2d 48, 54.)

. Neither the filing nor the making of this forged instrument (see Penal Law, § 170.00) was the subject of any charge against the defendant here.

. This final application, which might reasonably be construed as the document generating the immediate obligations of the city, was not made the subject of this indictment in any count.

. Commenting upon the need for the addition of subdivision 3 to section 175.00, the Supplementary Practice Commentary notes: “The sponsors’ supporting memorandum indicates their concern that the false filing crimes have thus been so restricted that they were of limited utility. ‘These sections [§§ 170.30,170.35 (sz'c)l should apply primarily to informative filings such as financial statements and other informative documents, rather than the falsification of legal instruments in the nature of deeds, contracts, and the like.’ ” (Hechtman, Supplementary Practice Commentary, McKinney’s Cons Laws of NY, Book 39, 1982-1983 Pocket Part, Penal Law, § 175.00, p 103.)

. This they did apparently because the Legislature had failed to specifically define a written “instrument” in this article in the same manner as it had been expressly defined in article 170 (forgery). While the court refused to carry to article 175 the definition of article 170, it might be argued that the Legislature’s failure to provide the definition for the expression in article 175 did not mean that it did not intend a definition of those words sufficiently expansive to serve the purpose of a law different in its scheme and scope from its predecessor, section 2051 of the Penal Law. (See Hechtman, Supplementary Practice Commentary, McKinney’s Cons Laws of NY, Book 39, 1982-1983 Pocket Part, Penal Law, § 175.00, p 103.)